[See Case No. 15,012.]

## Case No. 15,012.

### UNITED STATES v. DUSTIN et al.

[15 Int. Rev. Rec. 30.]

Circuit Court, S. D. Ohio. 1872.

CRIMINAL LAW — LIMITATION OF PROSECUTIONS — CONSPIRACY TO DEFRAUD—REVENUE LAWS.

1. An indictment has been pending in the United States circuit court for more than a year, alleging that the defendants conspired to defraud the United States of the taxes upon certain distilled spirits manufactured in the Sixth district of Ohio. A demurrer was filed to the indictment, upon the ground that the prosecution was barred by the two years statute of limitations of the act of congress of 1790 [1 Stat. 112].

2. The demurrer is overruled, and it is *held* that the thirtieth section of the act of congress of March, 1867 [14 Stat. 484], punishing conspiracies, is a "revenue law," and the period of limitation for offences against said thirtieth section is *held* to be five years instead of two.

[This was an indictment against Daniel G. Dustin and others, charging them with a conspiracy to defraud the government, in evading the payment of taxes upon distilled spirits. Heard on demurrer. See Case No. 15,011.]

EMMONS, Circuit Judge. This is an indictment under the thirtieth section of the act of March 2, 1867, which provides that "if two or more persons conspire to commit any offence against any law of the United States, or defraud the United States in any manner whatsoever, they shall be punished," etc. The title of the act is "to amend existing laws relating to internal revenue, and for other purposes." The act is a long one, and all of its many sections, save this and one other, relate solely to internal revenue. This section has reference to violations of revenue and other laws also, and the question is, whether the act of 1804 [2 Stat. 290], limiting the prosecution of offences "arising under the revenue laws" to five years, applies to conspiracies under said section when such conspiracies are solely to violate revenue laws. It is conceded that the act of congress of 1790, requiring prosecutions to be begun in two years, does apply if that of 1804 does not. There is, therefore, no necessity for a forced construction of the latter act in order to prevent the anomaly of a class of prosecutions without any limitation whatever. The court is to decide which of two limitation laws it believes congress intended should govern in prosecutions for violations of said thirtieth section, by conspiring to defraud the revenue.

We have been favored with arguments of great length and elaborateness, and if they are not in detail answered, it is not because they have not received a patient examination. The learned counsel for the defendants relied mainly upon two propositions. First, that the limitation act of 1804 had no application to laws for the protection of internal revenue, and second, if it did, it was to be confined to such offences as were created before its enactment. We find no difficulty in rejecting both assumptions. His third position, which affirms that, within the meaning of the statute, this offence does not arise under a revenue law, is, in our estimation, the only question worthy very serious consideration. No plausible reason is perceived for saying the word "revenue" in this and other laws where it is used broadly and generally, does not include internal revenue, as well as customs laws. The only matter of surprise is that it should ever have been necessary for the court to decide it. But the question has been discussed, and, as often as raised, decided adversely to those who sought to confine the meaning of the word "revenue" to external duties only. In U. S. v. Wright [Case No. 16,770], Judge McKennan, after what he terms a most elaborate argument, decided the precise point and applied the act of 1804 to the limitation of a prosecution under an internal revenue act. In Stevens v. Mack [Id. 13,404], Judge Blatchford, in deciding that the act of 1833 [4 Stat. 632], by its express provisions, referred only to causes arising under the customs laws, took pains to say that such would not be the effect of an act like this thirtieth section under consideration, where the general term "revenue" without qualifying clauses is used. There are several other similar statutes which have received the same reading. It might be shown from a consideration of all the legislation on this subject that to divide arbitrarily the laws into two classes, and decide that all provisions in reference to revenue laws meant customs laws only, would result in most absurd consequences. The absence of all reason for the interpretation asked renders such a labor unnecessary. We have not overlooked the remark of Judge Blatchford in U. S. v. Blaisdell [Case No. 14,608]. It is also said that the limitation act of 1804 is not prospective, but that it is to be confined to the offences created and defined by then existing laws. In Adams v. Woods, 2 Cranch [6 U. S. 336], it was decided that the limitation law of 1790 applied to subsequently created offences. That decision has been followed in Johnson v. U. S. [Case No. 7,418]; U. S. v. Ballard [Id. 14,507]; U. S. v. Mayo [Id. 15,755],—and is obligatory upon this court. Defendant's counsel says these decisions are erroneous and should be followed only in reference to the particular statutes they construed. We do not think so, but on the contrary believe they decide a principle

applicable to all general laws of limitation, including that of 1804. If we did not think so, the decision of the supreme court would still be followed in all its legitimate consequences until it was by the tribunal which pronounced it overruled or questioned.

This is all, under ordinary circumstances, which should be said in reference to this position, but the great length, pains-taking and earnest arguments of defendant's counsel upon this position demand a brief notice. No general statute of limitations in the whole history of our law, in England or here, was ever construed as we are asked by defendant's counsel to read this one. They are, of all others, from their nature and intention, eminently prospective, and the contest has been whether they shall affect at all existing causes of action, and how far they may do so under our American constitution. Every book upon criminal law treats them as applicable to future created offences. Limitation acts in England and in this country have stood for half a century limiting prosecutions under succeeding statutes creating offences of the same class and nature, and nowhere is there a judgment or dictum that they are to be confined to crimes under existing laws, any more than to existing offences under those already enacted.

The following are the judgments cited in support of this extraordinary position, and all of them expressly or by their argument, concede that they are exceptional, and rest upon the peculiarities of the statutes which they construe. In Hall v. State, 20 Ohio, 716, a law made it an offence to sell ardent spirits within three miles of furnaces in certain manufacturing counties, and it was construed to be applicable only to furnaces in existence at its passage. The judgment was delivered by a most able jurist, and were it in the least degree pertinent here we should deem it well to suggest the reasons for our dissent from its conclusions. But it is quite foreign to this discussion. It was a special law, did not create a general rule for the state, and rested expressly on these peculiarities. The learned court which pronounced it, apply no such rule as counsel seek to deduce from it, to the general statute of limitations of Ohio. They would deem it a most extraordinary use of Hall v. State, to apply its exceptional and professedly peculiar canon of construction to a reading of a general statute of limitation. The case of U. S. v. Paul, 6 Pet. [31 U. S.] 141, depended upon its own special circumstances. There are several similar judgments of the supreme court. It adopted the existing punishments of state laws at the time of the passage of an act of congress. These state laws were before congress and approbated. Of course congress did not approbate future punishments of which they knew nothing. Territorial laws of the United States in numerous instances when they adopt the laws of the states have been thus construed because from their nature such must have been

the intention of the law-makers. On the other hand, such is not the intention in the passage of statutes of limitation, especially when the same legislative body creates subsequent offences and affixes no different period of limitation. Every presumption of reason and law suggests the application of those which exist, if no new one is created. 5 Mod. 425, was before the supreme court in Adams v. Woods, and regarded, as evidently it should be, as having no reference to a general statute of limitations. If so disposed, as we are not, we have no right to repudiate this criticism of the supreme court. 6 Durn. & E. [6 Term R.] 286, decides only that merely athletic exhibitions or tumbling was not a stage play within a law which required a copy of all plays to be presented to the lord chamberlain for approval. The remark that the act contemplated such kinds of plays as were common at its passage, is undoubtedly true in that case, as in many others, but it has no tendency to show that the limitation act of 1804 applied only to those frauds which the dishonest men of that period had practiced, and which were punished by existing laws. Sedg. St. Const. Law, 276, is cited for a passage from Vattel, affirming the every day principle that fraudulent changes in the condition of property, in violation of the intentions of contracting parties, do not affect their rights. Our American books are full of better illustrations of this familiar doctrine. It is argued that because parties to contracts and treaties are, in the law, supposed to contemplate the condition of things when they are made, therefore a general statute of limitation will be confined to offences created before its passage. No analogy is perceived even if the passage referred to asserted a general rule, but it does not. It is only in that class of agreements or treaties which, from their nature show us such was the intention of the parties, that the interpretation is given. The law is the same in both instances. Treaties, agreements, and laws, and every other form of communication between men, must receive the same rational treatment. Language general in form will be held to contemplate the present or the future, or both, as the circumstances of its use indicate the one or the other to have been in the contemplation of the parties. When such, in justice, ought to be the interpretation, statutes of limitation have been applied solely to new causes of action. A short period of three years on a foreign judgment, although general in its terms, was construed to apply to future judgments only in Murray v. Gibson, 15 How. [56 U. S.] 421, and Boyd v. Barrenger, 23 Miss. 270. We have referred to all the judgments and authorities cited in the extended argument for the defence to sustain the position which we have no difficulty in overruling.

The more difficult question remains, does the offence with which defendants are charged arise under a revenue law? It arises un-

der that law to which we are compelled to refer in order to ascertain its character, and without which no charge can be sustained. In this instance no crime would be described but for those clauses in the revenue law, to violate which the conspiracy was formed. Repeal them and the indictment fails. They, and section 30 of the act of 1867, are both equally necessary for its support. The offence arises equally under both, and if we concede that the section is not itself a revenue law, and that the offence does not arise solely under such law, no violence is done to language by applying the limitation act of 1804, for that act does not require that the offence should. The history of interpretation is full of instances where courts, impressed with the impolicy and public injury of contrary rulings, have gone very far beyond the license of saying that this action arises under a revenue law, if it does so in part, and cannot be prosecuted at all if such law did not exist. But the literal technical reading is even stronger than this, because it is manifest this same section may be deemed a revenue law, an army law, or a naval law, just as the object of the conspiracy is to violate provisions of the statutes for the protection of one or the other of these departments. In such a reading there is nothing novel or anomalous. Let us suppose that instead of a general statute of limitation there was a separate one for the offences against each of those classes of law, and that in these circumstances such a conspiracy act as this under consideration was passed. It is evident the courts would be compelled to rule that the respective statutes of limitation would apply to different offences created by the same section, as the conspiracy might be to violate one or the other of those codes. If not, there would be no limitation to the crime of conspiracy. In such a case as supposed all would concede that different statutes of limitation must be applied to different conspiracies under the same section. Such a construction is now supported by a less pressing necessity than in the case supposed, because there is a general statute which may without violence be made applicable. But the principle is the same, and if there are sufficient urgent reasons to coerce it there is nothing either absurd or untechnical in its adoption. It is fully conceded that if the conspiracy were to fraudulently admit a foreigner to citizenship a different limitation would apply. In no sense, then, would the offence arise under a revenue law. If a revenue law, strictly so called, is the object of violation, the five years would govern, and there is no uncertainty in the rule in either case.

In our former colonial and territorial laws there are many statutes which, by adopting those of other states, and by reference to the common law, in the same section, and by the same words, created offences of far different grades subject to different punishments and limitations. Several recent acts of congress for the trial of state offenders who are denied civil rights by local laws embody the same principle. An act declaring that all offences should be defined and punished as at common law would be what the counsel for defendant says this law is, if we construe it as the counsel for the government asks. Every possible criticism of this technical character which is now made upon the proposed construction would be equally applicable if the law read as follows: "Any persons who shall conspire to commit any offence against the revenue laws, the laws for the protection of commerce, for the postal service, the army, or any law of the United States, shall," etc. Here we should be forced to say it was a revenue law, because expressly so saying, and apply the five years limitation to conspiracy to violate it. At the same time it would also be a piracy law, and an army law, conspiracies to violate which would not be limited to five years. But the statute as it now reads means precisely what it would in the supposed form. The compendious language used cannot alter its character. A law which provided for punishing conspiracies to commit offences against the revenue laws only would, of course, be a revenue law within the statute of 1804. This is conceded. If a law which provided solely for punishing such conspiracies would be so, it could by no reason lose that character because it added also the same penalties for the same offence in reference to other departments of the government. No such imputed absurdity, therefore, no such unheard of anomaly as counsel supposes, is to result from treating this one section now, with its compendious general form, including all laws, as we should be compelled to treat it if it specifically provided for conspiracies against the revenue laws, and added subsequently the general clause in reference to other laws. There may be some difficulty in its interpretation, but there are in the way of carrying out the actual intention of congress and the pressing necessities of the public safety no such literal and technical difficulties as are imagined.

That section 30 of the act of 1867 is found in an act the chief purpose of which is to impose taxes does not certainly make it solely a revenue law; but its location there may be looked to in its interpretation. It suggests connection between it and the condition of things which required its enactment. The conspiracies which called for it were, in the great majority of cases, those to violate revenue statutes. The instances also of its application thus far in nearly every case called to our attention are of the same character. We know as fully as any historical legal fact can be known that the leading object of the statute was to punish these offences. Experience before 1804 demonstrated that the short period of limitation of two years cut off nine-tenths of the prosecutions which public safety demanded.

These crimes it was ascertained then, and known still better now, are oftener than otherwise unknown until after that time has elapsed. Hence it was for them extended to five years, while for others it was still left at two years. Conspiracies to perpetrate crimes against the revenue are, if possible, still more covert and less subject to early discovery. It is an instructive fact, too, that in nearly every case of this character in this entire circuit, and we think all, this limitation statute of 1790, has been invoked to shield the offender. Legislation that permits such a result, more at war with the well understood policy demanded by the public safety in this class of cases, can not be imagined. If thus compelled to read it, it will add a practical proviso that under section 30 of the act of 1867, no prosecutions shall take place for conspiracies to violate the revenue laws. Its leading object will be defeated and an intention imputed to congress, we are certain it did not entertain. Looking to the previous condition of the law, the history of the wrongs which demanded this section, the object of its passage, the location of the section in a revenue statute, and the injurious and discreditable effect upon the administration of our criminal law, to send out of court flocks of wrong doers with impunity, we think our duty is quite clear to say that an indictment under it for conspiracy to commit an offence against the revenue laws may lawfully be found after twenty-four months.

Had this same section 30 been inserted in the original crimes act, contemporaneously with the general limitations act of 1790, it would not have been so construed. There would have been no other limitation than the one in that act. The facts and history would not, as now, warrant the interpretation we give it. But long before the act of 1867, that of 1804 had declared a different policy in reference to all offences against the revenue. The court of last resort had said such penal and criminal laws should not be construed in the narrow sense in which many common law judgments had read that class of acts. The onus probandi had, by statute, been changed in a large number of these cases, and this policy further illustrated by a liberal judicial action which had extended the principle much beyond the specific instances named in the letter of the statutes. We feel we have no right to take a step backward in this none too efficient course of legislation and judgment. The frequency and boldness of this class of offences has been partially checked by a vigorous administration of the law. It has been greatly aided by those wise and protective precepts which the court of last resort has established in the ascertainment of guilt. The unnecessary, impolitic and obstructive reading which this defence demands is at war with this course of decisions. An amendment of the existing statutes would not authorize the trial of those now guilty, and there is no necessity in our judgment, for asking it.

The learned counsel for the defendant cited several judgments to sustain the interpretation he asked. We have considered his references, and added a few others, not because they furnish guides for the particular interpretation here, but to suggest only that our courts, state and national, as well as those in England, have, in pursuit of what they thought the intention of the legislature, gone infinitely beyond the limits demanded by our judgment here. They are trammelled by no narrow rules, but so administer the statute as to obey most deferentially and implicitly what they think the law-makers meant. They do not require the most accurate or happy expression for this end, but read the words in a usual or unusual, in a general or limited, a popular or technical and scientific sense, just as, after a full consideration of all the facts which called for the enactments and the consequences of proposed constructions, they believe will best effectuate the objects of the provisions of law. It is most eminently true, in this department of law, that school definitions, and a formal logical nomenclature, are not only useless, but misleading. Judges and commentators have so often repeated this that it is no longer worthy of illustration. Mr. Sedgwick (page 227) says that the attempt to set up formal canons is ingenious and metaphysically "curious, but of no practical utility." Precedents may guide in reference to the right sources and limits of our inquiries in search of the intended meaning, and illustrate the almost unlimited liberty which it is our duty to take with the literalisms of a law, but afford slight aid in determining the meaning of an act in particular instances. 1 Bl. Comm. 59, says: "The signs by which we may seek the intention are the words of the contract, the subject matter, the effects and consequences, or the spirit and reason of the law." In Brewer v. Blough, 14 Pet. [39 U. S.] 178, it is said to be "the duty of the court to restrain the words of the law with narrow limits if satisfied that the literal meaning would extend it to cases not intended by the legislature." By no popular signification does the word "may" mean "must," but they have become to be nearly synonymous in the law of constitutions. See Miner v. Mechanics' Bank of Alexandria, 1 Pet. [26 U. S.] 16; Supervisors v. U. S., 4 Wall. [71 U. S.] 435; Galma v. Amy, 5 Wall. [72 U. S.] 705. "The law should be construed so as to effectuate it even if contrary to its letter," says Tonnele v. Hall, 4 Comst. [4 N. Y.] 140. A notable instance of interpretation is that of the supreme court of the United States, and many state tribunals, holding that "beyond seas" in a statute of limitations, means only "without the state." Murray v. Baker, 3 Wheat. [16 U. S.] 341; Shelby v. Guy, 11 Wheat. [24 U. S.] 361. The words

here can hardly be said to have been interpreted, but others have been supplied. Defendant's counsel cited 7 Mass. 306; 4 Cush. 214; 12 Mass. 383; 11 Ohio, 252. The points they adjudge are sustained by numerous other decisions. Garnishee laws referring to all debts are held not to reach those due by promissory notes, because the consequences would be so impolitic that the courts knew that such was not the intent of their makers. One of them held "all ships" did not include government ships, and the others are but illustrations of a familiar rule that general words, where the intention as adduced from the subject matter requires it, will be restrained to particular instances. The duty performed in these cases requires a similar one here to seek the intention, even, although a slightly less literal meaning may result. In 15 Johns. 358, 380, and which has been approved by the supreme court, it is said: "A thing within the intention is as much within the law as if within its letter, and that which is within the letter is not within the statute unless within the intention. Such interpretation should be put upon it as not to suffer it to be eluded." A two years' limitation upon section 30 of the act of 1867, will practically repeal it. The English stock-jobbing acts refer to all stocks. It was held, looking to their object, not to apply to foreign stock. Salkeld v. Johnston, 1 Hare, 196.

General clauses in usury laws declaring all contracts void are construed to make them voidable only at the election of the party injured. Under the head of waiver the most important constitutional and statutory provisions are construed to be applicable only at the election of the party, and that he must elect the very first opportunity. The statute of frauds positively declares certain agreements void. By what rule have courts held under so many such laws that part performance, the admission of the contract, etc., took it out of the statute, but that leading one applicable in all instances, that the presumed intention must be followed even at the expense of the letter? Pennsylvania and other states have said that clauses even in their constitutions in reference to the passing of laws are directory. The judgments disregarding the letter of statutes by holding them directory when no mere interpretation could effectuate legislative intent, are still more numerous. Among the most learned discussions of this subject, resulting in as extensive assumption of judicial liberty as any to be found in modern books, are those by the courts of New York in relation to the word "corporation," and in reference to which it was held that, although certain organizations were such, they were not so within the meaning and spirit of the constitution. 3 Const. [3 N. Y.] 485; 4 Hill, 384; 23 Wend. 103; 7 Hill, 510; 3 Seld. [7 N. Y.] 328. They come within the letter but not the intention. Far within the limits of these and numerous other prece-

dents, we are authorized to interpret the language of the thirtieth section of the act of 1867, as we propose, if such interpretation embodies the legislative intention. The letter and form will not stand in the way. It is said finally, these are criminal and penal laws, and must be construed in favor of the defendant if possible. If applicable this rule is in our way, for with much plausibility, to say the least, these laws might be differently rendered. We should be prepared to say, if necessary, however, that so far as statutes of limitation are concerned, and all the processes to bring an offender to trial, to ascertain his guilt, the old and irrational and frequently misapplied rules for the interpretation of penal and criminal acts have no application. It is only when the degree of punishment and the character of the offences are concerned, that they have been recognized. For the supreme court has said that all these laws intended to prevent fraud and protect the public revenue, should be liberally construed to effectuate the remedy and secure trial. That they must not be construed with other criminal and penal laws within the rule relied on. Cliquot v. U. S., 3 Wall. [70 U. S.] 115; Taylor v. U. S., 3 How. [44 U. S.] 197; 2 Am. Law Reg. (N. S.) 614; 7 Int. Rev. Rec. 6, and the earlier United States cases cited in these judgments. We should do violence to the reasons of these decisions were we to go back for maxims to the period when counsel and witnesses were denied to prisoners, in order to adopt a limitation which, in nine cases in ten, would enable this law to be evaded and the guilty to escape trial.

We should be quite satisfied with a judgment in conformity with this opinion, but when the cause was argued my Brother LEAVITT was on the bench. It is, therefore, pronounced by one member of the court as then constituted. He has now retired and cannot participate in it or dissent. My Brother SWING has not heard the arguments, and I am unwilling that these accidents shall deprive the defendant of the only opportunity he has under the laws to test the rectitude of this ruling. Had I no doubt, I would not take the step proposed, for it is by no means conceded that defendants have in all cases a right to what is called a full bench. Yet in no case, when after all available diligence, there remains such a condition of opinion as we find in this, have I failed when hearing the cause alone, at the request of defendant's counsel, and his undertaking in case of disagreement to follow the case to the supreme court to confer with my brethren, the district judges, and if the result create the occasion, unite in a certificate of division. If counsel ask it, such course will be taken in this cause. If so, they will submit additional copies of the briefs to the district judge, unless he is already supplied. I will add that two of the judges in other districts before whom similar questions are pending, concur in this judgment,

and should Brother SWING also concur, it is likely to constitute the law of this circuit until congress affords—what we all deem highly impolitic to withhold—a review of our judgments by writ of error. ·